J-S32028-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| RAYMOND GARLAND | : | |
| | : | |
| Appellant | : | No. 2678 EDA 2019 |

Appeal from the PCRA Order Entered August 15, 2019
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000749-2015

BEFORE: KUNSELMAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KING, J.:                    **FILED: DECEMBER 29, 2020**

Appellant, Raymond Garland, appeals from the order entered in the

Philadelphia County Court of Common Pleas, which dismissed his first petition

filed under the Post Conviction Relief Act ("PCRA").[1]  We affirm.

The PCRA court opinion set forth the relevant facts of this appeal as

follows:

> On October 20, 2014, at around 1 a.m., Khary Ford (known
> as "Deals"), Steven Robinson ("Shooter"), and [Appellant]
> ("Ghost") were selling drugs in the area of Jasper and
> Thayer Streets in Philadelphia….  At around this time,
> [Appellant] approached Ford and Robinson, who were in the
> same drug organization, and claimed that "four n*ggaz" just
> robbed him of his cell phone and $700.  [Appellant] told Ford
> to grab his pistol.  Ford, Robinson, and [Appellant] then
> searched the area for the alleged robbers.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S.A. §§ 9541-9546.

On the night of the shooting, [Appellant] was the drug organization's caseworker. The caseworker holds the majority of the money and passes out the bulk of the drugs to the distributors. After searching for a short time with [Appellant], Ford suspected that [Appellant] had faked the robbery and had stolen the drug money.

After they failed to locate anyone, Robinson and [Appellant] left Ford and walked to a Chinese restaurant at around 2:20 a.m. Around the same time, the decedent, Kevin Parker[,] who was not involved in any drug organization[,] left his home on the 1800 block of East Ontario for a 7-Eleven located on the same block to buy cigarettes. On the way to the Chinese restaurant, [Appellant], walking on the same block, spotted Parker, from around 130 feet away. After spotting Parker, [Appellant] said to Robinson, "I think that's the little motherf**ker right there." [Appellant] pulled out a black semiautomatic firearm and attempted to fire at Parker, but the safety was on. After removing the safety, he fired, killing Parker and hitting a windowsill of a house.

[A] medical examiner … determined that Parker's cause of death was a penetrating gunshot wound to the back. The bullet entered Parker's right, upper back and into the right chest cavity. The bullet passed through the lower left lobe of Parker's right lung and into the central portion of his chest cavity, perforating the lower airway and aorta, and stopping behind his left collarbone. The manner of death was homicide.

The Crime Scene Unit recovered projectile fragments on the ground in front of 1822 East Ontario Street. The frames for the window and the front door … had bullet holes. There was also a bullet hole in the window frame of 1818 East Ontario. The Crime Scene Unit recovered five Remington 9mm Luger fired cartridge casings ("FCCs") within a few feet of each other, diagonally across the street in front of 1839 East Ontario. All five FCCs were fired from the same firearm. The distance from the sidewalk in front of 1822 to the sidewalk in front of 1839 was roughly 130 feet.

After shooting Parker, [Appellant] and Robinson ran, eventually finding Ford. [Appellant] told Ford that he had

"dropped him," referring to the person he had just shot. Moments later, [Appellant] handed Ford a Luger firearm rolled inside a t-shirt and asked Ford to hide it inside his house. Later, Nate, a member of the same drug organization, retrieved the firearm from Ford's house. On November 20, 2014, Ford, in an interview with Philadelphia Police detectives, identified [Appellant], who[m] he knew as "Ghost," as the person who gave him the firearm the night of the shooting. Ford also selected [Appellant]'s photograph from an eight-person photograph array[] and identified himself in a still photograph taken from a 7-Eleven surveillance camera from the night of the shooting.

On November 19, 2014, Robinson, in an interview with detectives, identified [Appellant] as the shooter from a photograph array. He also identified himself, Ford, and [Appellant] in a still photograph taken from the 7-Eleven footage the night of the shooting. On December 8, 2014, Robinson told detectives that he saw [Appellant] while in custody at Curran-Fromhold Correctional Facility ("CFCF"). There, [Appellant] told Robinson that "they got [me] for that shooting," referring to the shooting on Ontario Street.

(PCRA Court Opinion, filed August 15, 2019, at 2-3) (quoting *Commonwealth v. Garland*, No. 2153 EDA 2016, unpublished memorandum at 2-4 (Pa.Super. filed March 13, 2017) (internal footnotes omitted)).

Following trial, a jury convicted Appellant of third-degree murder, carrying a firearm without a license, and possession of an instrument of crime ("PIC"). At a separate waiver trial, the court found Appellant guilty of persons not to possess firearms. On June 16, 2016, the court sentenced Appellant to an aggregate term of twenty-one (21) to forty-two (42) years' imprisonment. Appellant timely filed a notice of appeal. This Court affirmed Appellant's convictions for third-degree murder, PIC, and carrying a firearm without a license. Nevertheless, this Court reversed the conviction for persons not to

possess firearms.[2]   On August 22, 2017, our Supreme Court denied Appellant's petition for allowance of appeal.

On October 17, 2018, Appellant timely filed a *pro se* PCRA petition. Current, private counsel entered his appearance on November 4, 2018, and he filed an amended petition on Appellant's behalf on February 14, 2019. The amended petition raised multiple allegations of trial counsel's ineffectiveness. On June 7, 2019, the Commonwealth responded, asserting Appellant's claims lacked merit. The PCRA court issued Pa.R.Crim.P. 907 notice of its intent to dismiss the petition without a hearing on July 11, 2019. Appellant did not respond to the Rule 907 notice, and the court dismissed the petition on August 15, 2019.

On September 5, 2019, Appellant timely filed a notice of appeal. The court did not order Appellant to file a Pa.R.A.P. 1925(b) statement, and none was filed.

Appellant now raises six issues for our review:

> [Were Appellant's] rights to compulsory process … violated by trial counsel's ineffectiveness; and pursuant to 42 Pa.C.S.[A.] § 9543(a)(2)(vi)?
>
> [Whether t]he Commonwealth violated due process of law when it failed to disclose that Detective Nordo—who had interviewed the Commonwealth's key witness, Steven Robinson—had a history of misconduct, including paying for and coercing false witness statements?

---

[2] Because the reversal of this conviction did not upset the overall sentencing scheme, this Court did not remand the matter for resentencing.

[Whether t]rial counsel was ineffective for failing to investigate and present motive evidence that contradicted the [C]ommonwealth's trial theory?

[Whether t]rial counsel was ineffective for failing to introduce flash information that the shooter was on a bicycle?

[Whether t]rial counsel was ineffective for failing to object to the introduction of prejudicial and irrelevant testimony about ammunition found in a room containing Appellant's personal effects?

[Whether] Appellant should be granted relief based on the cumulative effect of counsel's ineffectiveness and due process violation?

(Appellant's Brief at 1-2).

Our standard of review of the denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error. *Commonwealth v. Conway*, 14 A.3d 101 (Pa.Super. 2011), *appeal denied*, 612 Pa. 687, 29 A.3d 795 (2011). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. *Commonwealth v. Boyd*, 923 A.2d 513 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). We do not give the same deference, however, to the court's legal conclusions. *Commonwealth v. Ford*, 44 A.3d 1190 (Pa.Super. 2012).

> To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing. We stress that an evidentiary hearing is not meant to function as a fishing

expedition for any possible evidence that may support some speculative claim of ineffectiveness.

*Commonwealth v. Roney*, 622 Pa. 1, 17-18, 79 A.3d 595, 604-05 (2013), *cert. denied*, 574 U.S. 829, 135 S.Ct. 56, 190 L.Ed.2d 56 (2014) (internal citations and quotation marks omitted).

In his first issue, Appellant contends trial counsel subpoenaed a witness, Leon Freeman, who failed to appear or testify at trial. Appellant asserts Mr. Freeman's "testimony would have provided an exculpatory version of the events preceding the shooting … such that the jury likely would have returned a verdict of not guilty on the homicide count." (Appellant's Brief at 16). Appellant claims trial "counsel gave up on securing [Mr.] Freeman's attendance" once trial commenced, counsel "was ineffective for not requesting one more overnight attempt to find him," and counsel's ineffectiveness violated Appellant's right to compulsory process. (*Id.* at 20).

Appellant emphasizes: 1) his trial was brief, with the Commonwealth resting its case on the second day; 2) the court would have been obliged to grant a continuance if counsel had requested additional time to locate Mr. Freeman after the Commonwealth rested; and 3) law enforcement ultimately took Mr. Freeman into custody on a bench warrant on the third day of trial. Appellant maintains counsel was ineffective for failing to request that the court reopen the record after Mr. Freeman was taken into custody, because the jury was still deliberating at that point. Appellant reiterates that Mr. Freeman's testimony would have cast doubt on the Commonwealth's theory of the case,

counsel had no reasonable strategic basis for his inaction, and, "but for counsel's failure, there is a reasonable probability that the outcome of the proceedings would have been different." (*Id.* at 21-22).

Even if reopening the record was not an appropriate remedy to enforce the right to compulsory process, Appellant suggests Mr. Freeman's testimony constitutes after-discovered evidence warranting a new trial. Appellant argues he exercised reasonable diligence to produce Mr. Freeman at trial, Mr. Freeman's testimony was not cumulative, the testimony would not be used merely to impeach, and the testimony would likely have produced a different result. Based upon the foregoing, Appellant concludes the PCRA court should have granted relief on the aforementioned bases. We disagree.

Pennsylvania law presumes counsel has rendered effective assistance. *Commonwealth v. Williams*, 597 Pa. 109, 950 A.2d 294 (2008). When asserting a claim of ineffective assistance of counsel, the petitioner is required to demonstrate: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and, (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball*, 555 Pa. 299, 724 A.2d 326 (1999). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. *Williams, supra*.

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis

for the assertion of ineffectiveness is of arguable merit...." *Commonwealth*

*v. Pierce*, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994). "Counsel cannot be

found ineffective for failing to pursue a baseless or meritless claim."

*Commonwealth v. Poplawski*, 852 A.2d 323, 327 (Pa.Super. 2004).

> Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests. If we conclude that the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective.

*Pierce, supra* at 524, 645 A.2d at 194-95 (internal citations omitted).

> Prejudice is established when [an appellant] demonstrates that counsel's chosen course of action had an adverse effect on the outcome of the proceedings. The [appellant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In [*Kimball, supra*], we held that a "criminal [appellant] alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

*Commonwealth v. Chambers*, 570 Pa. 3, 21-22, 807 A.2d 872, 883 (2002)

(some internal citations and quotation marks omitted).

"It is clear that under both our state and federal constitutions, a criminal

defendant has a right of compulsory process to obtain witnesses in his favor."

*Commonwealth v. McKenzie*, 581 A.2d 655, 657 (Pa.Super. 1990) (quoting

*Commonwealth v. Lahoud*, 488 A.2d 307, 310 (Pa.Super. 1985)).

> The right to compulsory process encompasses the right to meet the prosecution's case with the aid of witnesses, and the right to elicit the aid of the Commonwealth in securing

those witnesses at trial, both of which are fundamental to a fair trial. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. [The] constitutional right, though fundamental, is not, however, absolute. In order to compel the attendance of a witness at trial, it must be shown that the information possessed by the witness is material, *i.e.*, capable of affecting the outcome of the trial, and that it is favorable to the defense.

*Id.* (internal citations and quotation marks omitted).

Additionally, to obtain relief based upon newly-discovered evidence under the PCRA, a petitioner must establish:

(1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict.

*Commonwealth v. Washington*, 592 Pa. 698, 715, 927 A.2d 586, 595-96 (2007).

Instantly, Appellant's amended PCRA petition included the interview records for two statements that Mr. Freeman gave to police in November 2014. At the start of his November 12, 2014 interview, Mr. Freeman indicated that he did not know the victim. (*See* Exhibit A of Amended PCRA Petition, dated 11/12/14, at 1). Mr. Freeman frequented the 1800 block of Thayer Street, and he interacted with competing groups of neighborhood narcotics dealers. On the night of the shooting, Mr. Freeman was standing on the 1800 block of Thayer Street. He observed "two black guys walking from Ontario

Street on Jasper Street." (*Id.* at 2). The black men approached "three Spanish guys," brandished firearms, and said "Give me all your shit." (*Id.*) One "Spanish guy" began to comply with the robbers' demand, but the "short Spanish guy with a goatee ran away from the robbery, he ran into a house on 1900 Thayer Street." (*Id.*) After about two minutes, while the robbery was still in progress, "[t]he short guy with the goatee ran towards the robbery." (*Id.*) At that point, the robbers retreated towards Ontario Street.

Mr. Freeman heard "the other two Spanish guys asking the short Spanish guy, 'Where's the gun[?]'" (*Id.*) Mr. Freeman described a chaotic scene that followed:

> The short Spanish guy said "I must have [left] it in the car." I know "Deals" was sitting in a small green car (either a Toyota [or] Mazda) that was parked on Jasper facing the opposite direction of Ontario. "Deals" must have been sleeping in the car, I didn't know he was in there until the short Spanish guy ran up to the car. The short Spanish guy went in on the passenger side of the small green car and grabbed a gun from the driver's side. That's when I seen "Deals" pop up. The short Spanish guy ran towards Ontario Street. He was following the other two Spanish guys that got robbed. The short Spanish guy went left on Ontario towards Kensington but I saw the 2 black guys that robbed them jump in a gold minivan (a Ford Windstar). The 2 black guys' minivan was parked at Jasper and Ontario, it was parked far enough out to see straight down Jasper Street. The minivan was facing towards Kensington Avenue. The 2 black guys got in the gold Ford Windstar and made a U-turn and went back towards Frankford Avenue so the short Spanish guy with the goatee went the wrong way. After the short Spanish guy ran towards Ontario, "Deals" got out of the car. I was still able to see from where I was at that the short Spanish guy started chasing a black guy. The black guy was walking on Ontario Street towards Kensington, the black guy crossed over Jasper Street, I heard some

- 10 -

gunshots, about 4 at first, then I heard like 5 or 6 more back to back to back. "Deals" walked around to Ontario Street, he crossed Jasper Street and went towards Kensington. I heard "Deals" yell, "Come on, you shot the wrong guy." They all took off running….

(*Id.* at 2-3). A series of follow-up questions from police revealed that Mr. Freeman: 1) did not know the names of any of the "Spanish guys" who were robbed; 2) could not identify either of the black men who allegedly committed the robbery; and 3) did not see who fired the shots. (*Id.* at 4-5).

Police conducted a second interview with Mr. Freeman on November 13, 2014. At that time, police showed Mr. Freeman surveillance footage and still photos taken near the crime scene at the time of the shooting. Mr. Freeman identified individuals and vehicles in the photos, explaining how the images fit in with the narrative he provided in his prior interview. Mr. Freeman also stated that he heard the gunshots at "1:30 a.m. or 1:45 a.m." (*See* Exhibit B of Amended PCRA Petition at 3). Police asked Mr. Freeman if it was possible that he was still on the 1800 block of Thayer Street "at approximately 2:15 to 2:25 a.m.," closer to the time of the victim's death. Mr. Freeman responded, "I could have been, I never looked at my phone."[3] (*Id.*)

---

[3] In addition to the records for Mr. Freeman's interviews, Appellant's amended PCRA petition included an affidavit from a private detective who interviewed Mr. Freeman on December 21, 2018. (*See* Amended PCRA Petition at Exhibit D). The affidavit provides: "Mr. Freeman confirmed that the information contained in his statements to police was true." (*Id.*) The affidavit makes no mention of Mr. Freeman's willingness to cooperate at Appellant's trial.

The PCRA court evaluated Mr. Freeman's statement, concluding it "merely indicates that he heard gunshots and saw men running from the scene. This information is unlikely to result in a different outcome at trial since Freeman's statement does not contradict Ford and Robinson's testimony." (PCRA Court Opinion at 8). Here, the record supports the PCRA court's determination. **See Conway, supra**. We reiterate that Mr. Freeman did not know the victim, did not see the shooting, and could not be sure that he was still at the crime scene at the time in question.

At best, Mr. Freeman heard gunshots and saw Mr. Ford, whom he identified as "Deals," interacting with other individuals on the block. Such behavior is consistent with Mr. Ford's own testimony, wherein he indicated that he was selling drugs on Jasper and Thayer Streets on the night of the murder, and Appellant left his sight "a few times" during the early morning hours. (**See** N.T. Trial, 3/29/16, at 229-31). Under these circumstances, the information Mr. Freeman possessed was not "material," such that trial counsel's failure to present this witness resulted in a denial of Appellant's compulsory process rights. **See McKenzie, supra**. Likewise, Appellant's after-discovered evidence claim fails, because Mr. Freeman's testimony would not likely compel a different verdict. **See Washington, supra**. Therefore, Appellant is not entitled to relief on his first issue.

In his second issue, Appellant contends former Philadelphia Police Department Detective Philip Nordo took each of the pretrial statements from

Steven Robinson, who identified Appellant as the shooter. Appellant emphasizes Mr. Robinson's trial testimony "that he was threatened and bribed into giving the statements, forcing him to implicate Appellant." (Appellant's Brief at 32). Further, Appellant asserts "[i]t is now widely known that former Detective Nordo engaged in widespread and egregious instances of misconduct in the course of his work as a homicide detective, which led to his firing in 2017." (**Id.** at 35).

Appellant insists the Commonwealth violated **Brady v. Maryland**, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), because it "either willfully or inadvertently" suppressed evidence of Detective Nordo's past misconduct. (**Id.** at 37). Even if the Commonwealth was unaware of Detective Nordo's misconduct, Appellant argues "due process was violated because at the time of … trial, Nordo was a member of the prosecutorial team, acting on the government's behalf as a detective investigating [the] shooting." (**Id.**) Appellant concludes Detective Nordo's misconduct undermined the reliability of the verdict and amounted to a due process violation. We disagree.

"Under **Brady** and subsequent decisional law, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature." **Roney, supra** at 22, 79 A.3d at 607. "To establish a **Brady** violation, an appellant must prove three elements: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2)

the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued." *Id.*

Instantly, Appellant's amended PCRA petition included four articles from the local media, with publication dates ranging from April 13, 2017 to January 21, 2019. The articles detailed the misconduct allegations against Detective Nordo. (*See* Amended PCRA Petition at Exhibits E, F, G, and H). In one case, between June 2015 and January 2017, Detective Nordo deposited money into the prison account of an incarcerated individual. Detective Nordo also made phone calls to this individual, who was supposed to testify as the Commonwealth's witness at a murder trial. A defense attorney first discovered this misconduct in March 2017. Subsequent investigation revealed at least four cases where Detective Nordo's misconduct impacted the prosecution of a defendant. (*See* Exhibit H of Amended PCRA Petition at 2). Detective Nordo was fired in 2017 for "'knowingly and intentionally associating, fraternizing or socializing' with people connected to criminal conduct." (*Id.*)

The articles, however, did not indicate that the Commonwealth was aware of Detective Nordo's misconduct at the time of Appellant's trial in March 2016. In fact, the attorney who first discovered Detective Nordo's misconduct said that the detective "never disclosed [these transactions] to prosecutors." (*See* Exhibit E of Amended PCRA Petition at 1). The articles also failed to allege any misconduct related to Appellant's case.

In addition to the articles, Appellant attempts to link Detective Nordo's pattern of misconduct to his own case through the trial testimony from Mr. Robinson, who initially provided a statement to police identifying Appellant as the shooter. (*See* Commonwealth's Trial Exhibit 60, dated 11/19/14). At trial, Mr. Robinson denied witnessing the shooting. (*See* N.T. Trial, 3/29/16, at 159). When the prosecutor questioned Mr. Robinson about his prior statement, Mr. Robinson immediately responded that police had "threatened" and "bribed" him to obtain his cooperation. (*Id.* at 160). Mr. Robinson said police forced him to "give up" someone to avoid being charged himself, and they promised to pay him $20,000.00 to $30,000.00 after the case ended. (*Id.* at 161).

Thereafter, the prosecutor reviewed Mr. Robinson's prior statement with him. Mr. Robinson did not deny telling the police that Appellant had shot and killed the victim. (*See id.* at 173). After reviewing the prior statement, the Commonwealth played a videotape of Mr. Robinson's police interview. (*Id.* at 190).

The Commonwealth also presented testimony from Philadelphia Police Department Detective Frank Mullen. Detective Mullen testified that he was the lead detective in this case. (*See* N.T. Trial, 3/30/16, at 27-28). Detective Mullen confirmed that he was present for Mr. Robinson's interview, at which time Mr. Robinson identified Appellant as the shooter. (*Id.* at 46, 51). Detective Mullen also denied offering any money to Mr. Robinson in exchange

for his cooperation. (*Id.* at 53).

On this record, the PCRA court determined the Commonwealth did not commit a *Brady* violation: "[T]he Commonwealth did not suppress Nordo's misconduct, as it was unknown at the time of [Appellant's] trial in 2016." (PCRA Court Opinion at 13). The court acknowledged Appellant's argument that other instances of Detective Nordo's misconduct "would have endorsed the truthfulness of Robinson's testimony that he had been threatened and bribed." (PCRA Court Opinion at 12). Nevertheless, the court concluded Appellant "failed to establish how the outcome at trial would have been different, since this information [regarding police misconduct] was already made part of the record through Robinson's testimony and available for the jury to consider during deliberations." (*Id.* at 14).

In light of the applicable standard of review, as well as this Court's own inspection of the record, the PCRA court's determination is free from legal error. *See Conway, supra*. The articles attached to the amended PCRA petition did not demonstrate that the Commonwealth either willfully or inadvertently suppressed evidence of Detective Nordo's misconduct. *See Roney, supra*. Moreover, to the extent Appellant alleges misconduct in conjunction with his own case, the jury heard the testimony from Mr. Robinson, viewed the videotape of his police interview, and rejected Mr. Robinson's misconduct claim. *See Commonwealth v. Landis*, 89 A.3d 694 (Pa.Super. 2014) (reiterating that fact-finder is free to believe all, part, or

none of evidence and to determine credibility of witnesses). Accordingly, Appellant is not entitled to relief on his second claim.

In his third issue, Appellant contends that a police activity log for his case referenced an interview with Tonette Jones, a woman from Richmond, Virginia. Appellant claims Ms. Jones told police: 1) she heard about the victim's death; 2) her relative had spoken with the victim before he died; and 3) the victim told Ms. Jones' relative "that if anything happened to him, 'the white girl' had something to do with it." (Appellant's Brief at 39). Appellant emphasizes that the victim's girlfriend was a white female. Despite this information appearing in police records, Appellant complains trial counsel failed to investigate Ms. Jones' claims or present her as a trial witness.

Appellant argues Ms. Jones "could have potentially offered evidence of motive that would have cast doubt on the Commonwealth's theory of the case." (*Id.* at 40). Appellant maintains trial counsel had no reasonable basis for his inaction, and the outcome of the proceedings would have been different if counsel had further investigated Ms. Jones' assertions. Appellant concludes the PCRA court should have granted relief based upon trial counsel's failure to pursue this witness. We disagree.

For claims of ineffectiveness based upon counsel's failure to call a witness:

> A defense attorney's failure to call certain witnesses does not constitute *per se* ineffectiveness. In establishing whether defense counsel was ineffective for failing to call witnesses, a defendant must prove the witnesses existed,

the witnesses were ready and willing to testify, and the absence of the witnesses' testimony prejudiced petitioner and denied him a fair trial.

*Commonwealth v. Cox*, 603 Pa. 223, 267-68, 983 A.2d 666, 693 (2009) (internal citations omitted). A petitioner "must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." *Commonwealth v. Gibson*, 597 Pa. 402, 441, 951 A.2d 1110, 1134 (2008).

Regarding counsel's preparation for trial:

Counsel has a general duty to undertake reasonable investigations or make reasonable decisions that render particular investigations unnecessary. Counsel's unreasonable failure to prepare for trial is an abdication of the minimum performance required of defense counsel. The duty to investigate, of course, may include a duty to interview certain potential witnesses; and a prejudicial failure to fulfill this duty, unless pursuant to a reasonable strategic decision, may lead to a finding of ineffective assistance.

*Commonwealth v. Johnson*, 600 Pa. 329, 350-51, 966 A.2d 523, 535-36 (2009) (internal citations and quotation marks omitted).

Instantly, Appellant's amended petition included the police activity log for his case. The log indicated that Ms. Jones contacted Detective Mullen on October 23, 2014 and provided the following information:

Ms. Jones informed Det. Mullen she was the aunt of the decedent and raised him from the time he was 4 years old until he was 20 years old. Ms. Jones informed Det. Mullen she was from Richmond, VA and drove up to Philadelphia when she heard about the murder of decedent. Ms. Jones went on to state that while she was in Philadelphia she was suspicious of the behavior of one of the decedent's cousins.

- 18 -

> Ms. Jones stated that this particular cousin has (2) children with the decedent's girlfriend. Ms. Jones went on to state that she was informed by another relative of hers that before the decedent was shot and killed, the decedent informed this particular relative that if anything happened to him, "the white girl" had something to do with it.

(**See** Exhibit I of Amended PCRA Petition at 4).

Although Appellant's amended PCRA petition included the police activity log, the amended petition contained no additional documentation demonstrating Ms. Jones was ready and willing to testify at trial. **See Cox, supra**. Moreover, the PCRA court noted that Ms. Jones' proposed testimony constituted inadmissible hearsay. (**See** PCRA Court Opinion at 10). **See also Commonwealth v. Reid**, 627 Pa. 78, 97-98, 99 A.3d 427, 439 (2014) (explaining counsel could not be considered ineffective for failing to present inadmissible hearsay testimony); **Commonwealth v. Laich**, 566 Pa. 19, 777 A.2d 1057 (2001) (stating out-of-court declaration containing another out-of-court declaration is double hearsay; for double hearsay to be admissible, reliability and trustworthiness of each declarant must be independently established; this requirement is satisfied when each statement comes within exception to hearsay rule). We conclude the PCRA court's determination is free of legal error, and Appellant is not entitled to relief on this ineffectiveness claim. **See Conway, supra**.

In his fourth issue, Appellant asserts the 911 call log for this shooting stated "male shot on hwy/doer on bicycle … no further flash … caller said still hears shooting." (Appellant's Brief at 41). Further, Appellant contends

- 19 -

Philadelphia Police Officer Patrick Gereaghty provided a statement, wherein he recalled that the "flash information" he received was that the shooter was a black male on a bicycle. Appellant insists that information regarding what was said on the 911 call would have been admissible at trial, and it would have contradicted the testimony from the Commonwealth's witnesses, who did not mention the shooter being on a bicycle. Appellant also complains that Officer Gereaghty did not testify, even though his statement was included in discovery and the court mentioned him as a possible witness during *voir dire*. Appellant argues trial counsel should have presented evidence regarding the suspect's use of a bicycle, counsel had no reasonable strategic basis for failing to introduce such evidence, and Appellant suffered prejudice due to counsel's failure. Appellant concludes trial counsel was ineffective for failing to introduce evidence that the shooter was on a bicycle. We disagree.

Instantly, Appellant's amended PCRA petition included a record of the 911 call from the night of the shooting stating, "doer on bicycle." (**See** Amended PCRA Petition at Exhibit J). The amended PCRA petition also included the record of an October 20, 2014 interview with Officer Gereaghty, wherein he stated that he was one of the officers who responded to the police radio call about the shooting. When questioned about the existence of "flash information" on the shooter, the officer responded, "Just a black male on bicycle." (Exhibit K of Amended PCRA Petition at 1).

Police followed-up by interviewing James Morawski, the person who

actually made the 911 call. Mr. Morawski stated: 1) he was woken up by gunshots at approximately 2:19 a.m. on October 20, 2014; 2) he grabbed his phone, dialed 911, and informed the dispatcher that there was a shooting outside his residence; and 3) he looked at the monitor for his home surveillance system and observed a male on a bicycle outside the residence. (*See* Exhibit I of Amended PCRA Petition at 2). Although Mr. Morawski gave Detective Mullen access to the surveillance system, it was not properly functioning and did not record the incident.

Based upon the foregoing, the PCRA court determined that no relief was due. The court found the amended PCRA petition contained no additional documentation demonstrating Officer Gereaghty was ready and willing to testify at trial. (*See* PCRA Court Opinion at 5). The court also determined that evidence concerning the "flash information" was not material to Appellant's case because "the 911 caller never claimed that the male on the bicycle was the shooter." (*Id.*) Our review of the record compels us to agree with the PCRA court's determination that trial counsel was not ineffective for failing to introduce the evidence at issue. *See Cox, supra*; *Gibson, supra*. Thus, Appellant is not entitled to relief on his fourth claim.

In his fifth issue, Appellant acknowledges that the trial court properly permitted the admission of relevant evidence concerning a nine-millimeter round recovered from a bedroom linked to Appellant. Nevertheless, Appellant contends the court improperly admitted "testimony about other ammunition

and a live round found in the same bedroom." (Appellant's Brief at 45). Appellant insists the evidence about other ammunition that was not used in the shooting was highly prejudicial. Appellant argues trial counsel should have objected to the prejudicial evidence, his failure to object was unreasonable, and the outcome of the proceedings would have been different if the Commonwealth was not allowed to introduce the evidence. Appellant concludes trial counsel was ineffective on this basis. We disagree.

"Relevance is the threshold for admissibility of evidence." *Commonwealth v. Tyson*, 119 A.3d 353, 358 (Pa.Super. 2015) (*en banc*), *appeal denied*, 633 Pa. 787, 128 A.3d 220 (2015).

> Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or tends to support a reasonable inference or proposition regarding a material fact. Relevant evidence may nevertheless be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Commonwealth v. Danzey*, 210 A.3d 333, 342 (Pa.Super. 2019), *appeal denied*, ___ Pa. ___, 219 A.3d 597 (2019) (internal quotation marks omitted).

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, evidence of a crime, wrong, or another act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan,

knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). "In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." *Id.* "A weapon not 'specifically linked' to the crime is generally inadmissible; however, the fact 'the accused had a weapon or implement suitable to the commission of the crime charged … is always a proper ingredient of the case for the prosecution.'" ***Commonwealth v. Christine***, 633 Pa. 389, 400, 125 A.3d 394, 400 (2015) (quoting ***Commonwealth v. Robinson***, 554 Pa. 293, 306, 721 A.2d 344, 351 (1998), *cert. denied*, 528 U.S. 1082, 120 S.Ct. 804, 145 L.Ed.2d 677 (2000)).

Instantly, Detective Mullen testified regarding a search conducted 4922 North Marvine Street, an address Appellant "had access to." (N.T. Trial, 3/30/16, at 59). In a second floor bedroom, police recovered court documents made out to Appellant, as well as letters and envelopes with Appellant's name and the nickname "Ghost." (***See id.*** at 64). Police also recovered thirty-five .380 caliber rounds and "one live 9mm round and one live rifle round." (***Id.*** at 65). Significantly, police also recovered nine-millimeter fired cartridge casings from the crime scene. (***See id.*** at 85).

In evaluating Appellant's claim that trial counsel should have objected to testimony regarding any ammunition other than the nine-millimeter rounds, the PCRA court noted:

> [Appellant's] access to the 9-millimeter ammunition is
> relevant because it makes it more likely that he had access

to the murder weapon or the type of ammunition used to commit this murder. While trial counsel should have objected to the Commonwealth's introduction of the rifle rounds and .380 caliber rounds, excluding this evidence would not change the outcome at trial, and [Appellant] was not unduly prejudiced. The Commonwealth presented sufficient evidence, such as video surveillance and eyewitness testimony, to implicate [Appellant].

(PCRA Court Opinion at 7-8). We agree that, but for trial counsel's omission, the result of the proceeding would not have been different. **See Chambers, supra**. Therefore, Appellant is not entitled relief on his fifth claim.

In his final issue, Appellant suggests that he is entitled to relief based upon the theory that his claims cumulatively undermine confidence in the convictions. Nevertheless, "no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually. When the failure of individual claims is based upon a lack of prejudice, however, then the cumulative prejudice from those individual claims may properly be assessed." **Commonwealth v. Elliott**, 622 Pa. 236, 294, 80 A.3d 415, 450 (2013), *cert. denied*, 574 U.S. 828, 135 S.Ct. 50, 190 L.Ed.2d 54 (2014) (internal citations omitted). Here, we have rejected only one of Appellant's claims based upon the prejudice prong of the test for ineffectiveness. Thus, there can be no aggregation of prejudice from multiple ineffectiveness claims, and Appellant's claim of cumulative error fails. **See id.** Accordingly, we affirm the order dismissing the PCRA petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/29/20</u>